UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause No. 1:19-CR-0231-JRS-DLP |
| TONY FRANKLIN, | ) |
| | )    (-4) |
| Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by counsel, Zachary A. Myers, United States Attorney for the Southern District of Indiana, and Tiffany J. Preston, Assistant United States Attorney ("the Government"), hereby submits its Sentencing Memorandum regarding the defendant, Tony Franklin.

### I.    Summary

Tony Franklin (hereinafter "Mr. Franklin" or "defendant") was the owner of Franklin Building and Design, LLC ("Franklin Building").  As set forth below, Mr. Franklin was one of the corrupt Paying Contractors identified in the Superseding Indictment who directly participated in and benefitted the most from the scheme to corrupt the bidding process for the Muncie Sanitary District Infrastructure Projects.

As described in more detail below, out of all of the conspirators, Mr. Franklin benefitted the most financially in this scheme.  As a direct result of Mr. Franklin's payments of kickbacks to Muncie public officials, Muncie Sanitary District paid Mr. Franklin's company a total of

$1,826,260.90.  As a result of the entire conspiracy in which Mr. Franklin was a knowing participant, the citizens of Muncie lost $1,032,682.40.

**II.**    **Procedural Background**

On March 11, 2020, a Grand Jury returned a twenty-count Superseding Indictment in the Southern District of Indiana against Mr. Franklin, Phil Nichols, Debra Nicole Grigsby, and Jess Neal. Count 1 alleges that all four defendants, Tracy Barton, and others conspired to commit wire fraud between March 2015 and October 23, 2018, in violation of 18 U.S.C. § 1349, and Counts 2 through 6 charge Mr. Franklin and others with Wire Fraud.  Count 17 alleges that Mr. Franklin knowingly and willfully made materially fictitious and fraudulent statements in violation of 18 U.S.C. § 1001(a)(2).

On June 22, 2021, the parties filed a Petition to Enter Plea of Guilty and Plea Agreement. Mr. Franklin, under Federal Rule of Criminal Procedure 11(c)(1)(B), agreed to plead guilty to Count 1 of the Superseding Indictment. Following imposition of sentence, the government will move to dismiss, without prejudice, Counts 2 through 6, and 17 of the Superseding Indictment as they relate to him.   In the plea agreement, the United States agreed to seek no more than $286,806.99 in restitution from the defendant.   At sentencing, the United States will seek $279,806.99, which was calculated by apportioning fault to the defendant by percentage.

As of the date of this filing, neither the Government nor the defense object to the findings set forth on the Guidelines in the Presentence Investigation Report ("PSR").    With acceptance, and considering the Government's under seal filing, Mr. Franklin's offense level is 17.  Combined with a criminal history category of I, Mr. Franklin's  Guideline range is 24 to 30 months' imprisonment.   Mr. Franklin disagrees with the Government's apportionment and calculation of restitution.

III.   **Related Cases**

Mr. Franklin was charged as part of a series of investigations by the Federal Bureau of

Investigation ("FBI") and the United States Attorney's Office targeting systemic public corruption

in Muncie, Indiana.  The related cases are as follows:

*United States v. Craig Nichols*, 1:17-cr-00021-TWP-DML (Mr. Nichols was sentenced to
on January 22, 2019 to 24 months' imprisonment);

*United States v. Tracy Barton*, 1:18-CR-0234-JRS-DLP (Mr. Barton was sentenced on
October 20, 2022 to 1 year of probation);

*United States v. Jeff Burke*, 1:18-CR-285-SEB-DLP (Mr. Burke was sentenced on January
5, 2021 to 6 months' imprisonment and 6 months' home confinement);

*United States v. Rodney Barber*, 1:19-CR-190-JMS-DML (Mr. Barber was sentenced on
September 6, 2022, to 2 years' probation and $104,250 in restitution);

*United States v. Dennis Tyler*, 1:19-CR-360-JRS-TAB (Mr. Tyler was sentenced on
November 10, 2021, to 12 months' and 1 day imprisonment, 3 years' supervised release,
and $15,250.00 in restitution);

*United States v. Phil Nichols, Debra Nicole Grigsby, Jess Neal, and Tony Franklin*, 1:19-
CR-231-JRS-DLP (Mr. Neal was sentenced on February 2, 2022, to 24 months'
imprisonment, 2 years supervised release, and $55,650.00 in restitution.  Mr. Nichols is
now deceased and his case was dismissed.  Ms. Grigsby was sentenced on May 5, 2022, to
12 months' and 1 day imprisonment, 2 years' supervised release, and $370,556.99 in
restitution).

IV.   **The Bid Rigging Conspiracy**

A.   The City of Muncie and the Muncie Sanitary District

The City of Muncie ("Muncie") is located in the Southern District of Indiana.  According

to initial data from the 2020 census, there are approximately 65,000 people who call Muncie home.

Between 2015 and 2019, and according to census data, the average income for a resident of Muncie

was approximately $33,000, and there was a poverty rate of nearly 31 percent.  The local hospital,

Ball State University, the school district, and the City government and its agencies are among

Muncie's largest employers.   Muncie is a small, close-knit, midwestern city that is full of

hardworking people.  It isn't a large metropolis governed by a vast bureaucracy.  The people of Muncie place their trust in a small group of government officials—many of whom are on a first-name basis with their constituents.

The functions and services provided by Muncie were coordinated through various agencies and departments.  One such agency was Muncie Sanitary District—the victim of this conspiracy.  Muncie Sanitary District was a special unit of government created under Indiana State Law by a Muncie ordinance adopted in 1968.  MSD was located in the Southern District of Indiana.  The Muncie Sanitary District Board ("MSDB") was a three-member board whose responsibilities included approving or disapproving claims reports from MSD's public officials seeking authorization for payment to contractors hired to do work for MSD.  Muncie/MSD maintained a business bank account at First Merchant's Bank Corp. ("Muncie's City Account").

MSD provided vital services to Muncie residents.  Residents and businesses living and operating in Muncie paid MSD for its services such as recycling, sanitation, sewer maintenance, and storm water management.  But, MSD also served another vital function—levee certification.

### *MSD's Critical Infrastructure Projects During the Conspiracy Period*

Understanding MSD's  infrastructure projects arising out of the levee recertification during the conspiracy time period is important because Mr. Franklin and his co-conspirators sought to profit off of the bidding process associated with that critical work.  Beginning in or around 2014, the Federal Emergency Management Agency ("FEMA") had a number of conditions that Muncie needed to satisfy in order for FEMA to agree to recertify a section of a levee in and around the White River.  One of the conditions was that MSD had to protect the area behind the levee in order to effectively deal with at least a 10-year rainfall event when the river was at flood stage.  MSD considered several options to address the recertification, and settled on retaining and holding back

the excess stormwater, and bleeding it into the undersized flood control system at a rate it could handle.  To do so, MSD decided to acquire parcels of property situated near the White River, demolish homes and businesses existing on the parcels, and construct levees or storage basins so that the entire levee system could be recertified. As set forth in the Superseding Indictment, the factual basis of the Plea Agreement, and in PSR, these public works projects designed to improve Muncie's Sewer, Sanitary, and Flood Control Systems were referred to as the "MSD Infrastructure Projects".  The MSD Infrastructure Projects were targeted by Mr. Franklin and his co-conspirators in the bid rigging scheme described below.

Although planning for the work began earlier, the conspiracy period related to the MSD Infrastructure projects began in March 2015 and continued through and including October 23, 2018.  In addition to the levee projects, MSD Infrastructure Projects also included separating and repairing the existing storm, sewer, and sanitary sewer lines, extending the existing sewer system, improving the existing wastewater treatment facility, and building associated tanks.

The MSD Infrastructure projects were directed by MSD and its public officials.  It managed portions of the projects with its own employees and subcontractors, and also hired larger engineering and construction firms to complete more complicated aspects of the work.

Beginning in late 2015 and continuing until at least October 23, 2018, MSD contracted with subcontractor Bowen Engineering to complete the remaining MSD Infrastructure projects. All of the MSD Infrastructure Projects, including those managed by Bowen Engineering, occurred during the conspiracy period set forth in the Superseding Indictment, namely March 2015 to October 23, 2018.

*The First Round of Demolitions for the MSD Infrastructure Projects*

Beginning sometime after MSD settled on its plan for addressing the levee, MSD sought out to purchase the parcels of land along the White River. Once purchased, MSD had to hire contractors to inspect, sometimes remediate, and then demolish the homes and businesses on the parcels of land. Payments to contractors who performed work on the MSD Infrastructure Projects were drawn from MSD/Muncie's bank account. Given that residents and businesses living and operating in Muncie paid MSD for its services (those taxpaying citizens are referred to as "ratepayers"), there were procedures in place to ensure that their money wasn't squandered. Namely, before entering into a contract or agreement to perform a MSD public works project expected to cost less than $150,000, the Indiana Public Works Law required MSD public officials (such as Mr. Barton and Mrs. Grigsby) to:

• Solicit quotes from at least three responsive contractors who were known to perform the type of work the contract required, at least seven days before the quotes were due (the "Seven Day Waiting Period"). The Seven Day Waiting Period did not apply to quotes for work expected to cost less than $25,000;

• Open and read the quotes aloud in a public forum; and

• Award the contract or agreement to the lowest responsive contractor who submitted a quote.

Additionally, before entering into a contract or agreement to perform a MSD public works project expected to cost more than $150,000, the Indiana Public Works law required MSD officials to:

• Generate plans for the work, make the plans available to interested bidders, and publicly announce the bidding opportunity;

- Open and read aloud quotes for the project in a public forum; and

- Award the contract or agreement to the lowest responsive contractor who submitted a quote.

Again, these competitive bidding procedures were designed to ensure that the most qualified, and *lowest* responsive bidders would be awarded the public serve work.  Given Muncie taxpayers who paid rates to MSD were funding these projects, they were entitled to receive the best work for the least amount of money.  They were entitled to receive competitive bidding that was free of concealed kickbacks and bribes. But, as set forth below, Mr. Franklin and his co-conspirators corrupted the bidding process for their own gain.  In short, Mr. Franklin and others engaged in a bid-rigging scheme designed to steer MSD contracts to bribe and kickback paying contractors.

### B.   The Co-Conspirators and Contractors

Mr. Franklin is one of many individuals who participated in the bid-rigging conspiracy.



Co-defendant Phil Nichols was the leader of the conspiracy. Mr. Nichols served as the Chairman for a political party in Delaware County ("the political party") from approximately 1990 through approximately 1998, and was a resident of the Southern District of Indiana.  The political party maintained its headquarters in Muncie, Indiana ("the political party's headquarters"), which is also in the Southern District of Indiana.   Though Mr. Nichols had no official position or title within the political party after approximately 1998, he maintained a private office at the political party's headquarters, and continued to exert influence and control over multiple official acts performed by certain Muncie public officials.

Mrs. Grigsby and Tracy Barton ("Mr. Barton") were Muncie public officials.  Mrs. Grigsby was the District Administrator of MSD, and was appointed to the position in 2014.  As District Administrator for MSD, Mrs. Grigsby was responsible for approving the selection of contractors to perform work on MSD Infrastructure Projects, and signed maintenance contracts on MSD's behalf.  Mrs. Grigsby presented claims reports to the MSD Board ("MSDB.")  Claims reports included information such as the name of the contractor seeking payment from MSD, the date and amount of the invoice, and a summary of the work performed.  By presenting the claims reports to the MSDB, Mrs. Grigsby represented to the MSDB that the contractors requesting payment were the lowest responsive contractors, and that their invoices were accurate and legitimate. After the MSDB approved the claims reports, MSD employees were authorized to pay contractors via checks drawn from Muncie's City Account.

Tracy Barton was MSD's Superintendent of Sewer Maintenance and Engineering.  He was appointed to the position in 2013.   As MSD's Superintendent, Tracy Barton reported to Mrs. Grigsby, and was responsible for selecting and managing certain MSD contractors.

Jess Neal was Mrs. Grigsby's friend and a former police officer. He acted as a middle man between Mr. Franklin and Mr. Nichols, and paid and funneled bribes and kickbacks from Mr. Franklin to and through Mrs. Grigsby and up to Mr. Nichols.

There were also a number of contractors who participated in the bid-rigging conspiracy. But, Mr. Franklin was the paying contractor who profited the most. He, as set forth above, was the owner of Franklin Building and Design, LLC ("Franklin Building"). Rodney Barber ("Barber") was the owner of Barber Contracting, Inc. Mr. Barber was charged and sentenced in a related case before Judge Jane Magnus-Stinson. Persons A, B, and C were owners of Companies A, B, and C, respectively.[1] Franklin Building, Barber Contracting Inc., and Companies A, B, and C performed contracting work for MSD. Mr. Franklin, Mr. Barber, and Persons A, B, and C are referred to collectively here and in the Superseding Indictment as "the Paying Contractors."

C. The Defendants' Scheme to Corrupt the Bidding Process for the MSD Infrastructure Projects

The conspiracy began in March 2015 and continued until October 23, 2018. As set forth in Count 1, the principal purpose of the conspiracy was to corrupt the bidding process associated with the MSD Infrastructure Projects to enrich the co-defendants and their co-conspirators. Some of the conspirators referred to the bid-rigging scheme as "the Program." As set forth in the Superseding Indictment, Mr. Franklin and his co-conspirators: 1) rigged bids and falsified quotes and invoices in order to steer MSD public works projects to the Paying Contractors; 2) presented materially false and fraudulent claims reports to the MSDB; 3) caused the MSDB to approve payment to the Paying Contractors for the false and fraudulent invoices included in the claims reports; 4) caused the clearing of checks drawn from the Muncie City Account to be deposited into

---

[1] The Government has addressed the differences between Mr. Franklin, and Mr. Barton, Mr. Barber, and Persons A, B, and C in the under seal filing.

the business bank accounts of the Paying Contractors; 5) solicited and/or accepted bribes and kickbacks from the Paying Contractors and Mr. Neal; and 6) concealed that Mr. Nichols, Mrs. Grigsby, Mr. Neal, and Mr. Barton solicited and accepted bribes and kickbacks from the Paying Contractors and Mr. Neal.

Mr. Nichols was the "kingmaker."  Though he had no official role in Muncie City Government or MSD, he maintained a powerful political control over Muncie officials, including Mrs. Grigsby and Mr. Barton.  During the conspiracy period, contractors who wished to do work for MSD had to be "greenlighted" by Mr. Nichols.  Only contractors who had agreed to pay bribes or kickbacks to public officials, and/or make contributions to certain political campaigns or parties were greenlighted.

The conspiracy began in or around March 2015 with Person C, owner of Company C, which was a landscaping business.  Mr. Nichols and Mr. Barton agreed that Mr. Barton would illegally steer Company C a $140,000 contract to mow the levee in Muncie in exchange for a 10% kickback destined for Mr. Nichols.  Although the previous mowing contractor had submitted a legitimate and lower quote, Mr. Barton did not award the contract to him (because he did not pay the 10% kickback).  Instead, and at Mr. Nichols' direction, Mr. Barton solicited two other illegitimate quotes that were higher than Person C's, and awarded the mowing contract to Company C.  Mr. Barton did so even though the $140,000 amount was double what it would from the previous contractor.

After Mr. Barton awarded the contract to Company C, Mr. Barton delivered the cash kickback to Mr. Nichols.  Person C then continued to pay cash kickbacks typically between $1,600 and $1,700 to Mr. Barton for the duration of the mowing contract, and Mr. Barton delivered the cash to Mr. Nichols.  Through cooperating witness proffers and a consensually recorded in-person

meeting between Person C and Mr. Barton, the Government has proven that Mr. Nichols accepted the cash kickbacks from Person C and was well aware of the mowing kickback scheme.   Mr. Barton continued to obtain fraudulent higher mowing quotes each year from other contractors (including Mr. Barber, Company A and Company B) so that Person C would continue to win the mowing contracts.   Ultimately, because Mr. Nichols and Mr. Barton steered the mowing contract to Person C's company, he agreed to submit false and fraudulent bids for demolition work to Mr. Barton knowing full well his landscaping company would not be awarded the work.

 In September 2015, MSD began making way for the Infrastructure Project by purchasing homes and businesses where the improvements to the levee system were needed.   MSD had to hire a number of contractors to demolish the homes and businesses they had acquired.   Pursuant to Indiana law, public officials like Mrs. Grigsby and Mr. Barton were supposed to engage in a legitimate competitive and public bidding process that was designed to protect the taxpayer and ensure that Muncie hired the most qualified, lowest responsive bidders.   Instead, the co-conspirators rigged the system and profited off of the backs of the taxpayers.

During the MSD Infrastructure projects, Mr. Nichols used his influence and control within the political party to direct the performance of official acts by Mrs. Grigsby and Mr. Barton within MSD, namely, their decisions to corrupt the bidding process at the MSD to enrich themselves and their co-conspirators.   Again, Mr. Nichols only greenlighted those contractors who were willing to pay to play, and ensured that Mrs. Grigsby and Mr. Barton only hired those contractors who were willing to pay bribes and kickbacks. Sometime in or around October, 2015, Mr. Barton approached Mr. Barber, and Persons A, B, and C knowing that they had already been greenlighted by Mr. Nichols and would be willing to present false and fraudulent bids and pay kickbacks to Mr. Barton and/or Mr. Nichols.   Mr. Barber, and Persons A, B, and C agreed to submit false and

fraudulent bids and pay Mr. Barton  kickbacks in exchange for a guarantee by Mr. Barton that their companies would be awarded a portion of the demolition work regardless of the true competitiveness of their bid, or for other work MSD through Mr. Barton would fraudulently steer in their direction.  As set forth above, even though Company C was a landscaping business, Person C submitted false and fraudulent high bids because Mr. Barton and Mr. Nichols had illegally awarded him the mowing contract.   Mr. Barton was Mrs. Grigsby's subordinate and she was eventually fully aware of his criminal actions and did nothing to stop them.  Instead, and as set forth in the Government's Sentencing Memorandum in Mrs. Grigsby's case, she participated in them.

Meanwhile, Mr. Neal had developed a friendly relationship with Mrs. Grigsby as a result of his work as a political operative.  Sometime in or around September 2015, Mr. Neal approached Mrs. Grigsby, and convinced her to steer work to Mr. Franklin's company, Franklin Building.  She agreed. Mr. Neal gave Mrs. Grigsby a Victoria's Secret gift card purchased on September 18, 2015—one of many kickbacks she received from Mr. Neal and Mr. Franklin during the conspiracy period.

Mrs. Grigsby and Mr. Barton then divided up the demolition work between the Paying Contractors.   As set forth in the below table, Mr. Barton and Mrs. Grigsby illegally steered demolition contracts to Barber Contracting, Inc., Franklin Building, and Companies A and B in exchange for something of value including cash kickbacks, benefits, money, or property paid to Mr. Nichols, Mr. Barton, and Mrs. Grigsby.  Those particular demolitions were managed by MSD and began on October 5, 2015, and lasted until May 4, 2016.

In order to make the process appear to be legitimate, the "winning" contractor had to be the lowest, responsive bidder.  That meant that the remaining contractors had to submit higher bids

that were false and fraudulent.  Paying contractors knew that Mr. Barton and Mrs. Grigsby would ensure that on some occasions, they would be the "lowest" bidding contractor, and on others, one of the highest.  That way, each participating contractor knew going in that they would win a certain percentage of the work (in exchange, of course, for bribes and kickbacks).  Of course, all of the co-conspirators, including Mr. Franklin, concealed the fact that they were either paying or accepting bribes and kickbacks associated with the MSD Infrastructure Projects.

Accordingly, Mr. Nichols, Mrs. Grigsby, Mr. Neal, Mr. Franklin, Mr. Barton, and others, caused MSD to award demolition contracts arising out of the MSD Infrastructure Projects to the following Paying Contractors in exchange for something of value, including cash kickbacks, benefits, money, or property:

| Contractor | Number of Bids | Number of Awards | Value of Awards |
|---|---|---|---|
| Franklin Building and Design, LLC | 7 | 7 | $147,100 |
| Barber Contracting, Inc. | 38 | 14 | $ 263,274 |
| Company A | 36 | 18 | $ 376,219 |
| Company B | 4 | 1 | $ 16,000 |
| Company C[2] | 34 | - | - |
| Total | 119 | 40 | $ 802,593 |

Importantly, Mr. Franklin was the only contractor to win every demolition bid that he submitted during the MSD Infrastructure Scheme.  As discussed in more detail below, Mr. Franklin won every bid because Mrs. Grigsby was Mr. Barton's boss and instructed him to award all seven of those jobs to Mr. Franklin, and then she agreed to steer the remaining demolitions to Mr.

---

[2] Company C agreed to submit high bids knowing that his landscaping company wouldn't win the demolition work because Mr. Nichols and Mr. Barton had awarded him the inflated mowing contracts.

Franklin through Bowen Engineering (see further below).  In hindsight, their scheme was pretty obvious—rather than bid each demolition individually, the contracts were awarded in clusters:



(U//LES) This map depicts a total of 37 property locations, based on street address and land parcel. Each location is symbolized by the specific contractor involved.

(U) This map was created for domain operational purposes.

The first round of demolitions results in approximately $802,593 in fraudulent contracts awarded to the Paying Contractors.  Mr. Franklin received $147,100 in fraudulent contracts. Person C also received $134,185 for the illegal mowing contract.  But, the scheme didn't stop with the first round of demolitions.  As set forth below, Mr. Franklin continued to receive fraudulently steered demolition contracts for the remaining MSD Infrastructure Projects from December 3, 2015 to at least October 23, 2018.

In total, the co-conspirators orchestrated more than $1.8 million in fraudulent contracts arising out of the scheme.  Mr. Franklin's role in this conspiracy is addressed in the next section.

## V.  Tony Franklin's Role in the Criminal Conspiracy

The above description sets forth the scope and purpose of the criminal conspiracy.  Below is a more fulsome explanation of Mr. Franklin's role as a co-conspirator.

A.  <u>Mr. Franklin is Awarded 7 Demolition Jobs in Exchange for Bribes and Kickbacks paid by and through Jess Neal to Mrs. Grigsby and Mr. Nichols</u>

Mr. Neal and Mrs. Grigsby knew each other well.  They had worked in the same political circles and Mr. Neal  frequently operated out of Muncie City Hall.  In or around February of 2013, Mr. Neal met with Mrs. Grigsby in her office, and told her that "they" said that she needed to help Mr. Neal fundraise for Mayor Tyler and the political party.  Mrs. Grigsby called another Muncie official and Mr. Nichols who both explained to her that if she wanted to keep her job at MSD, she had to agree to fundraise for Mr. Tyler and the political party.   This directive set the stage for Mrs. Grigsby's understanding that if both she and her husband wanted to keep their government jobs, they had to answer to Mr. Nichols.[3]

*Mr. Neal Directs Mrs. Grigsby to Illegally Steer MSD Infrastructure Contracts to Mr. Franklin*

In the fall of 2015, Mr. Neal saw an opportunity to use his political influence by corrupting the bidding process associated with the MSD Infrastructure Projects.  As set forth above, Mr. Neal approached Mrs. Grigsby, and directed her to steer demolition contracts to his friend Mr. Franklin.  She agreed.  Mrs. Grigsby then instructed Mr. Barton (her subordinate) to hire Mr. Franklin for the first two demolition jobs.  Those jobs were on 414 and 416 Myrtle.  According to both Mrs. Grigsby and Mr. Barton, Mr. Barton initially pushed back because Mr. Franklin had not been greenlighted by Mr. Nichols.  As set forth in text exchanges between Mr. Barton and Mrs. Grigsby, the two argued about her decision to hire Franklin Building without first getting Mr. Nichols' approval.  Ultimately, Mrs. Grigsby was Mr. Barton's superior, and he relented.

---

[3] Mrs. Grigsby's husband was also employed by MSD.

Importantly, in order to facilitate Mrs. Grigsby's instructions to steer work to Mr. Franklin, Mr. Barton created a bidding form for the demolitions and asked Mr. Barber and Person A to submit false and fraudulent bids so that Mr. Franklin could win the 414 and 416 Myrtle Demolitions. For his part, Mr. Neal purchased a Victoria's Secret Gift Card on September 18, 2015 for Mrs. Grigsby as an initial kickback (one of many) for agreeing to steer the work to Mr. Franklin. Mr. Franklin obtained his bidding form from Mr. Neal, through Mrs. Grigsby, and began his role as part of the conspiracy.

Mr. Barton warned Mrs. Grigsby that steering work to Mr. Franklin wasn't going to go over well "downtown." And, it didn't. After Mrs. Grigsby steered the Myrtle demolition jobs to Mr. Franklin, Mrs. Grigsby was summoned to Mr. Nichols' office at the political party headquarters. Once there, Mr. Nichols scolded Mrs. Grigsby for hiring Mr. Franklin because Mr. Franklin was not a member of "the Program" (meaning, a paying contractor in the conspiracy at the time). Mrs. Grigsby left the meeting, and Mr. Barton and Mr. Nichols later laughed about her reaction. Mrs. Grigsby ceased awarding work to Mr. Franklin as a direct result of Mr. Nichols' admonishment.

Later, Mr. Neal paid a visit to Mrs. Grigsby to see why his friend Mr. Franklin wasn't getting any more MSD demolition work. Mrs. Grigsby told Mr. Neal about her meeting with Mr. Nichols. Sometime later, Mr. Neal summoned Mrs. Grigsby to one of his apartments where Mr. Franklin was doing construction work. Mr. Neal showed Grigsby around, and then took her outside of the apartment in full view of Mr. Franklin. There, Mr. Neal handed her an envelope that she could tell was filled with an unknown amount of cash. Mr. Neal gestured over to Mr. Franklin who was on a ladder, and as Mr. Franklin waved to Mrs. Grigsby, Mr. Neal told Mrs.

Grigsby that the money was from Mr. Franklin, and that she should deliver the envelope to Phil Nichols, and tell him that it was from Mr. Franklin.

Mrs. Grigsby went immediately to the political party's headquarters, walked into Mr. Nichol's office, and gave the cash bribe to Mr. Nichols.  She did not count the money, but based on thickness of the envelope believed it was thousands of dollars.  Other witnesses have opined that the amount was likely tied to the "10%" kickback rule that had been long ago established by Mr. Nichols.

Mrs. Grigsby told Mr. Nichols that the cash was from Mr. Franklin, and that Mr. Nichols could use it for Duke Campbell's campaign, or "whatever."[4]  Mr. Nichols then put the cash in a drawer right in front of her.  As alleged in the Superseding Indictment, and stipulated in the factual basis of several plea agreements including Mr. Neal's, Mrs. Grigsby's and Mr. Franklin's, this was an illegal cash payoff.  Mr. Nichols then greenlighted Mr. Franklin.

Afterwards, Individual B confirmed that MSD could continue to award additional demolition contracts to Franklin because Franklin had "paid his dues," which Mrs. Grigsby understood to mean that Mr. Franklin, through Mr. Neal and Mrs. Grigsby, had given the cash bribe to Mr. Nichols.  Mr. Franklin then submitted fraudulent quotes to Mr. Neal for MSD for Franklin Building to demolish three additional homes arising out of the MSD Infrastructure Projects.  Mr. Barton obtained fraudulent quotes from Barber Contracting, Inc., and Companies A, B, and C, so that Franklin Building's quotes for the demolitions arising out of the MSD Infrastructure Projects would be the lowest.

In total, and as a direct result of Mr. Franklin's participation in the criminal conspiracy, Mr. Franklin received $147,100 in the first round of demolition contracts.  But, that was just the

---

[4] At the time, Duke Campbell was running for County Commissioner. Incidentally, there were no officially recorded cash campaign donations from Mr. Nichols, Mrs. Grigsby, Mr. Franklin or Mr. Neal to Mr. Campbell's campaign.

beginning, and Mr. Franklin went on to profit much more than any other participant from the conspiracy.

B. Mr. Franklin Submits False and Fraudulent Invoices for Costs his Company Didn't Incur

Mr. Franklin knew that those projects had been steered to his company through the illegitimate bid-rigging scheme. He then intentionally submitted bogus invoices to MSD seeking payment for demolitions which included the cost of waste disposal and hauling arising out of the MSD Infrastructure Projects even though he knew that MSD had paid for those costs. In other words, Mr. Franklin submitted invoices for dumpster fees he knew his company didn't incur. These costs are referred to as "dumpster fees." Costs associated with dumpster rental and fees are typically a huge expense for contractors in demolition projects. As a direct result of Mr. Franklin's false invoices, and his criminal relationship with Mrs. Grigsby and Mr. Neal, MSD paid Franklin Building for the waste disposal and hauling costs arising out of MSD Infrastructure Projects. Mrs. Grigsby did not verify that Franklin Building actually incurred those costs. Instead, MSD also paid Company D directly for Franklin Building's waste disposal and hauling costs arising out of MSD Infrastructure Projects, despite the fact that MSD had already reimbursed Franklin Building for the exact same purported costs. In total, Mr. Franklin billed MSD $263,827 for dumpster fees he didn't incur. Mr. Franklin knew he could get away with such an obvious fraud because he had was "juiced in" by Mr. Neal and Mrs. Grigsby.

According to Mrs. Grigsby, in March 2016, Mr. Barber had complained that he was not received the same benefit as Mr. Franklin associated with the dumpster fees. Mrs. Grigsby said that she was conflicted. According to Mrs. Grigsby, she consulted with Mr. Neal before writing a letter addressed to Mr. Franklin requesting that he repay an unspecified amount for the dumpsters.

Mr. Neal asked that Mr. Franklin be given until the end of the year (nine months away) before payment was required.  Mrs. Grigsby agreed.

In fact, Mr. Franklin never repaid MSD for any of his dumpster costs, and continued to allow MSD to pay for his dumpsters through the remainder of their scheme.  According to Mrs. Grigsby, she never attempted to collect Mr. Franklin's dumpster costs because of the criminal conspiracy she was engaged in with Mr. Neal and Mr. Franklin.  Importantly, this all occurred during the overall conspiracy period, and after Mrs. Grigsby had steered the Bowen Engineering demolitions to Mr. Franklin.

C.  <u>Mr. Franklin Receives $759,840 in Illegally Steered MSD Infrastructure Contracts from MSD through Bowen Engineering</u>

Mr. Franklin also received $759,840 in illegally steered contracts between December 3, 2015 and October 23, 2018.  In summary, beginning in or around late 2015, MSD contracted with Bowen Engineering to complete the remaining MSD Infrastructure Projects.  This work was still a part of the MSD Infrastructure Projects, and involved additional demolitions to make way for the greenspace.

In summary, during this time period, Mr. Neal had already paid Mrs. Grigsby kickbacks in exchange for steering the first round of demolitions to Mr. Franklin.  As those demolition projects were underway, Mrs. Grigsby and Mr. Neal ensured that when Bowen Engineering took over managing the remaining demolitions associated with the MSD Infrastructure Projects, Bowen would continue to use only Mr. Franklin's company to complete them.  In exchange for steering that work, Mr. Neal paid Mrs. Grigsby $1,000 in gift cards, directed Mr. Franklin to donate $500 to a fundraiser directly benefiting Mrs. Grigsby, and attempted to give her $2,000 in cash.  After Mrs. Grigsby rejected the last cash bribe, Mr. Neal gave Mrs. Grigsby a gold necklace and several

sports jerseys, which she kept.  During the same time period, Mr. Franklin paid nearly $75,000 in lease payments to Mr. Neal.  As set forth in more detail below, Mr. Franklin's corrupt conduct resulted in $759,840 in fraudulent contracts awarded by Bowen to Franklin Building.

<u>*MSD Enters into Guaranteed Savings Contracts with Bowen Engineering*</u>

In or about the spring of 2016, the FBI's investigation into bid-rigging and other corrupt conduct in Muncie had become well-known.  Indeed, the FBI had already served a number of subpoenas on Muncie Government entities and Controller's Office and businesses belonging Craig Nichols, Muncie Building Commissioner and son of Mr. Nichols.  Mrs. Grigsby called Mike Cline, one of the MSD Board Members.  According to Mrs. Grigsby, she told Mr. Cline she wanted out of the "political nightmare."  Mrs. Grigsby further told Mr. Cline that something was "off"  with Mr. Barton, referring to rigged bids, and that she wanted someone outside of MSD to take over. She did not care who Mr. Cline contacted, but wanted to be disassociated with the demolitions in an attempt to distance herself from the wrongdoing.  Moving forward, MSD was engaged with two Guaranteed Savings Contracts with Bowen Engineering for the purpose of completing many of its MSD Infrastructure Projects. But, adding Bowen Engineering to the mix didn't prevent the conspiracy from continuing.  In fact, it made it easier.  Importantly, the GESCs allowed MSD to avoid the bidding requirement of Indiana's Public Works Laws described above.  It turns out that MSD was able to manipulate the Indiana's Guarantee Energy Savings Contract statute by designating MSD projects as "energy savings" when they were not. In other words, the use of the GESCs was the  perfect vehicle to steer contracts to preferred contractors who paid kickbacks or provided other financial benefits, such as Mr. Franklin because corrupt officials like Mrs. Grigsby were now not even  required to competitively bid the projects.

*Mr. Franklin Receives the Remaining MSD Infrastructure Demolition Projects through Bowen Engineering as a Direct Result of the Conspiracy*

Even though the community was well aware of the ongoing FBI investigation, Mr. Franklin continued to knowingly participate in the conspiracy.  He ensured that before Mrs. Grigsby handed over management of the projects to Bowen, that she illegally arranged for Mr. Franklin's company to receive the remaining MSD Infrastructure demolition projects in exchange for kickbacks from Mr. Neal and Mr. Franklin.

In December of 2015, Mrs. Grigsby first directed Bowen Engineering to award demolition work resulting from an MSD Infrastructure Project to Mr. Franklin without requiring three bids. In other words, the conspiracy continued, unabated, but now Mrs. Grigsby didn't have to undergo the pretext of acquiring two or three fake bids to make it happen.   Subsequently, Bowen Engineering awarded two more demolition contracts to Mr. Franklin, again without following any public bidding laws.

A wrinkle developed when Bowen Engineering employees heard rumors of the FBI investigation into Craig Nichols, which also involved fraudulent bidding practices for City demolitions.  Bowen Engineering then decided the safest route was to solicit bids from local demolition contractors, which they did. After a half-hearted bidding process, described later, Mrs. Grigsby attended an October 6, 2016 progress meeting with  Paul Creasey, Paul Glotzbach, Bowen Engineer Howard McClanahan, and MSD Board members Joe Evans and Mike Cline.[5]   At the meeting, the group discussed the remaining demolitions that were part of the MSD Infrastructure Projects.  Bowen Engineering representatives asked Mrs. Grigsby for her opinion regarding which demolition contractor they should hire to complete the demolitions.   Not surprisingly, Mrs.

---

[5] Paul Glotzbach was a Senior Project Manager for United Consulting, and Paul Creasey was a Project Manager for Bowen Engineering.

Grigsby told them that "if all things were equal" she would recommend Franklin Building.   In other words, she steered the work to Mr. Franklin—who, through Mr. Neal, had been paying her kickbacks and who, through Mr. Neal, would continue to pay her kickbacks.

According to Mrs. Grigsby, Mr. Evans came to the MSD office the same day as the progress meeting or shortly thereafter, and asked her to call Mr. Franklin.  Mr. Evans told Mrs. Grigsby to tell Mr. Franklin that if he was going to get the  remaining demolition work he had  to "sharpen his pencil," which she understood to mean to lower his bid for the work.  Mrs. Grigsby subsequently called Mr. Franklin from her work phone. She told Mr. Franklin that Bowen Engineering was going to hire him for the remaining demolition work, but that he needed to "sharpen his pencil." She also reminded Mr. Franklin that MSD was paying for the expensive cost of providing the dumpsters needed to remove the demolition debris (hence, he would not have to include that expense in his bid).  Franklin responded "okay, thanks."

Around the same time period as the progress meeting, Mrs. Grigsby also met with Mr. Neal.  Mr. Neal asked for the meeting, and Mrs. Grigsby understood that he wanted to be updated about Franklin Building's demolition work.  Mrs. Grigsby and Mr. Neal talked on the sidewalk. She told Mr. Neal about the progress meeting and what Mr. Evans had said about Mr. Franklin's bid.  Mr. Neal told Mrs. Grigsby that he was glad Mr. Franklin was going to get the Bowen demolition work and made the comment that "he [Franklin] can continue to pay his bills."  Mr. Neal's comment makes perfect sense given that Mr. Franklin  would soon begin paying him $2,500 each month to rent warehouse and office space, so certainly Mr. Neal had a financial incentive to ensure that Mr. Franklin had a steady income from MSD work.  Importantly, without the work Mr. Franklin fraudulently obtained from MSD and Bowen Engineering, he would not have been able

to keep "paying his bills."  In fact, during the conspiracy period, those two entities accounted for 81% percent of Franklin Building's revenue.

In the fall of 2016, as Mrs. Grigsby and another MSD Board member were leaving the Bowen Progress meeting, she had another conversation with Joe Evans. They both agreed that they wanted FBD to be awarded the Madison Street demolition contracts despite his price being <u>higher</u> than other contractors. Mrs. Grigsby suggested to Mr. Evans that MSD could pay for Franklin Building's dumpsters. Mr. Evans agreed that Mrs. Grigsby should offer to pay for FBD's dumpsters and that Grigsby should tell Franklin to "sharpen his pencil". They did not discuss, nor did Mrs. Grigsby in fact offer to pay for other contractor's dumpsters.

After getting Mrs. Grigsby's call, Mr. Franklin complied and sent a new, lower quote to Mr. Creasey (one that continued to explicitly assume responsibility for the dumpster costs he knew he wouldn't pay). His quote came down to $29,770, still almost double the lowest bidder. Even after rigging the bid and excluding a major component of his cost, Mr. Franklin still could not compete. But Mrs. Grigsby had already promised Mr. Neal that Franklin Building would keep getting Bowen's demolition work, so just minutes after receiving the updated pricing from Mr. Glotzbach, she kept her promise by directing Bowen to award the work to Mr. Franklin.

Importantly, when Mrs. Grigsby said that she would prefer that Franklin Building be awarded demolition if "all things were equal", she knew (and did not disclose) that in fact, Franklin Building's bid was <u>not</u> equal to the other contractors' because Mrs. Grigsby did not offer to pay for other contractor's dumpster costs.  Mrs. Grigsby offered to pay for Franklin Building's dumpsters because of her loyalty to Mr. Neal and because they were all in the same criminal conspiracy.

Mrs. Grigsby's recommendation to Bowen Engineering to use Mr. Franklin carried significant weight. After all, Mrs. Grigsby represented MSD, and MSD was Bowen Engineering's client. Other witnesses have corroborated her information, and would testify that Mr. Franklin was indeed allowed to "sharpen his pencil" and submit a revised and lower bid.

In total, Mr. Franklin was awarded $759,840 in demolition contracts after Mrs. Grigsby ensured that Bowen would use Franklin Building exclusively. The kickbacks and bribes that Mr. Grigsby received from Mr. Neal and Mr. Franklin occurred before, during, and after the Bowen contracts. They were very much a part of the jointly undertaken criminal conspiracy, and reasonably foreseeable to Mr. Franklin.

### *Kickbacks Paid by Mr. Neal to Mrs. Grigsby in Exchange for Steering Work to Mr. Franklin*

In exchange for rigging the first set of seven demolitions as well as the remaining MSD Infrastructure demolition contracts from MSD through Bowen Engineering to Mr. Franklin, Mr. Neal paid Mrs. Grigsby thousands of dollars in gift cards, some of which were traced to Mr. Franklin's bank account (Best Buy, Dick's Sporting Goods, and Saks Fifth Avenue) and some he bought himself (Victoria's Secret and Coach gift cards) . Mr. Neal also attempted to give Mrs. Grigsby $2,000 in cash. But, by then, the FBI's public corruption investigation had begun, and Mrs. Grigsby returned the money to Mr. Neal while they were both at City Hall. Mr. Neal then gave Mrs. Grigsby a gold necklace, jersey, and ensured that Mr. Franklin would contribute $500 toward her daughter's fundraiser. Mrs. Grigsby returned the Saks Fifth Avenue gift card having spent a portion of the $1,000. In total, and accounting for the returned gift card, Mrs. Grigsby received $2,623.76 in bribes and kickbacks from Mr. Neal and Mr. Franklin. That paled by comparison to the nearly $2 million in contracts Mr. Franklin received.

In exchange for setting up Mr. Franklin with the bid-rigging scheme, Mr. Neal charged Mr. Franklin $17,375 which the two attempted to disguise as "headhunters fees," but in reality, was Mr. Neal's cut for his efforts to direct Mrs. Grigsby to steer work to Mr. Franklin. Additionally, in exchange for being juiced into "The Program," Mr. Franklin gave Mr. Neal a debit card with direct access to Mr. Franklin's business checking account. Between December of 2015 and February of 2017, Mr. Neal used that card to spend $5,635.36 on himself and to buy the $1,000 Saks gift card used as a kickback/bribe to Mrs. Grigsby.  In December 2015, Mr. Franklin paid $1,979.49 for a Samsung range delivered to an apartment he was renovating for Mr. Neal.

These payments were just the tip of the iceberg. In February of 2017, Mr. Neal purchased a vacant warehouse for $205,000.  In March of 2017 he entered into a lease requiring Mr. Franklin to pay $2,500 each month.  At the end of the agreement, Mr. Franklin was granted the option to buy the property for $375,000, an 83% profit.  Mr. Franklin paid Mr. Neal $74,168 before his fraud was uncovered. When Mr. Neal said Mr. Franklin's contracts with Bowen would allow him to continue paying his bills, these are the payments to which he was referring.

## VI.   The Probation Officer's Findings were Correct

The PSR correctly concluded that Mr. Franklin is responsible for an intended loss of $1,826,260.90 as a result of this conspiracy and scheme. (PSR, p. 11, paragraph 54).  That loss was correctly calculated as follows:

| | |
|---|---|
| (1) MSD Jobs Paid by the City to Paying Contractors | $802,593 |
| (2) MSD Jobs Paid to Franklin Building from Bowen | $759,840 |
| (3) Best Way Dumpsters Paid by MSD for Franklin Building | $263,827.90 |

**TOTAL: $1,826,260.90**

As set forth in the PSR, after identifying and discovering the extent of fraud in the scheme described above, the government solicited estimates for reasonable costs for the work performed as a result of the fraudulent contracts awarded to Franklin Building, Barber Contracting, and Companies A and B.  Quotes from the contractor revealed that the demolitions could have been completed for much less had they been competitively bid.  Regarding the cost of the bogus dumpster fees, the PSR agreed that Mr. Franklin knowingly abused his position as the favored contractor, and submitted costs for dumpsters that Franklin Building didn't actually occur.

While the offense resulted in total payments of $1,826,260.90, credits against this loss were applied for the fair market value of the services rendered to MSD by other persons acting jointly with the defendant prior to the detection of the offense, pursuant to Application Note 3(E)(1) of §2B1.1.  As documented in Paragraph 55 of the PSR, the fair market value of the services was $807,497.00. When subtracted from the total amount paid, the remaining loss is $1,018,763.90.

Accordingly, the beginning offense level of 7 was correctly adjusted upward by 14 levels. The Adjusted Offense Level was 21, but accounting for timely acceptance and the Government's under seal filing becomes 17.  Based upon a total offense level of 17 and a criminal history category of I, the guideline imprisonment range is 24 to 30 months' imprisonment.

## VII.   Defendant's Arguments Regarding Dumpster Costs

In his sentencing memorandum, the defendant argues that he should not be held responsible to pay restitution for the $263,827.90 in fake "dumpster costs" he billed to MSD knowing he didn't incur them.  Mr. Franklin seems to shift responsibility to Mrs. Grigsby for agreeing to pay both Mr. Franklin and Company D, which actually performed the work.  But, Mr. Franklin is directly responsible for this loss.  He prepared and submitted bogus invoices for $263,827.90 worth of work he knew he didn't perform.  He knew that he could get away with the flagrant fraudulent

billing because his bids (unlike other contractors) were not subject to scrutiny because of his payments to Mrs. Grigsby.

## VIII.   **Restitution and Apportionment of Fault**

Accounting for the actual loss, and adjusting for apportionment of fault, Mr. Franklin is responsible for $279,806.99 in restitution.[6]  The apportionment considered the participation of the other participants, and the actual loss caused by each defendant.  Mr. Franklin argues that the calculation is unfair, and doesn't account for "extensive concrete" and safety measures (which he neither explains nor itemizes).

The Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A-3664, requires that a court order a defendant convicted of fraud or conspiracy to commit fraud to make restitution to his victims. 18 U.S.C. § 3663A(c).  Restitution is mandatory under the MVRA unless the victims cannot be identified or are so numerous, or the determination of their losses so complex, that restitution is impracticable. 18 U.S.C. § 3663A(c)(3); *see also U.S. v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003). Restitution must be imposed in "'the full amount of each victim's losses as determined by the court'" unless one of the exceptions applies.  *Catoggio,* 326 F.3d at 326 (quoting 18 U.S.C. § 3664(f)(1)(A)).  Co-conspirators may be held jointly and severally liable for restitution owed to the victims of the conspiracy. The governing statute grants a sentencing court discretion to "make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss." 18 U.S.C. § 3664(h). *See also U.S. v. Sensmeier*, 361 F.3d 982, 990 (7th Cir. 2004) (recognizing the discretionary nature of § 3664(h)); *U.S. v. Booth*, 309 F.3d 566, 576 (9 Cir. 2002) (noting that "[t]he court had the discretion to apportion the [restitution], but was not required to do so").

---

[6]  Mrs. Grigsby and Mr. Neal were also apportioned fault in this manner.

Thus, where, as here, several defendants are convicted of participating in a scheme, conspiracy, or pattern of criminal activity, each may be held liable, jointly and severally, for the full amount of losses caused by the scheme. *See U.S. v. Nucci*, 364 F.3d 419, 423-24 (2d Cir. 2004)(affirming district court's restitution order against defendant for full amount of loss, as opposed to apportioning each defendant's liability); *U.S. v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (noting that a court may "order a single defendant to pay restitution for all losses caused by the actions of that defendant as well as by the actions of that defendant's co-conspirators"); *U.S. v. Collins*, 209 F.3d 1, 4 (1 Cir. 1999) (holding that "[i]n the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his coconspirators"); *U.S. v. Nichols*, 169 F.3d 1255, 1278 (10 Cir. 1999) (affirming district court's restitution order and finding defendant liable for all losses caused in furtherance of the conspiracy); *U.S. v. Plumley*, 993 F.2d 1140, 1142 (4 Cir. 1993) (same); *U.S. v. Bogart*, 490 F. Supp. 2d 885, 897 (S.D. Oh. 2007).

The government bears the burden of establishing the losses sustained by victims by a preponderance of the evidence. 18 U.S.C. § 3664(e). Inability to calculate losses precisely, however, does not preclude an order of restitution; rather, a court need only make a reasonable determination of the losses identifiable victims have sustained.  "The primary and overarching goal of the MVRA is to make victims of crime whole" and, "[i]n achieving this objective, Congress intended district courts to engage in an expedient and reasonable restitution process." *U.S. v. Gordon*, 393 F.3d 1044, 1048 (9 Cir. 2004). *See also U.S. v. Futrell*, 209 F.3d 1286, 1291-92 (11 Cir. 2000) (finding that restitution could be based on a "reasonable estimate" of the loss), cited with approval in *Catoggio,* 326 F.3d at 329; *U.S. v. Savoie*, 985 F.2d 612, 617 (1 Cir. 1993) (holding that, "so long as the basis for reasonable approximation is at hand, difficulties in achieving

exact measurements will not preclude a trial court from ordering restitution"); *U.S. v. Fogel*, 494 F. Supp. 2d 136, 139 (D. Conn. 2007) (finding the "Government's methodology for computing restitution to be reasonable"); 18 U.S.C. § 3664(a) (requiring a probation officer to make reasonable efforts to ascertain the number and identity of the victims).

Here, the Government could have held each defendant jointly and several liable for the entire restitution amount.  Instead, it has asked this Court to apportion fault and has engaged in a fair and equitable apportionment between charged co-conspirators.  The analysis the Government undertook did take into account similar demolitions and did indeed factor in the added costs of demolishing homes with a basement.

Accordingly, the United States requests that the defendant's objection to the restitution calculation be overruled.

**VIII.**  <u>**Additional Factors for the Court's Consideration under 18 U.S.C. 3553(a)**</u>

There are several mitigating factors that this Court should consider at the time of sentencing, and the Government reserves the right to address those factors at that time.  They were well documented by Ms. DiNardo and Ms. Guy in dockets 248 and 250.


ZACHARY A. MYERS
United States Attorney


By:   */s/ Tiffany J. Preston*
Tiffany J. Preston
Assistant United States Attorney
Office of the United States Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
Email:  Tiffany.Preston@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2022, a copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM was filed electronically under seal. Parties may access this filing through the Court's system. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. A copy has also been provided to counsel of record via electronic mail.

By:   */s/ Tiffany J. Preston*
      Tiffany J. Preston
      Assistant United States Attorney
      Office of the United States Attorney
      10 W. Market St., Suite 2100
      Indianapolis, Indiana 46204-3048
      Telephone: (317) 226-6333
      Email:  Tiffany.Preston@usdoj.gov